Filed 5/28/25  In re E.F. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.F., a Person Coming Under the Juvenile Court Law. | H052482<br>(Santa Clara County<br> Super. Ct. No. 22JD027362) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>A.D.,<br><br>        Defendant and Appellant. | |

Mother, A.D., appeals the juvenile court's order terminating her parental rights to the minor child, E.F., and selecting adoption as E.F.'s permanent plan.  Mother's sole argument on appeal is that the juvenile court impermissibly found that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq., ICWA) and related California law (Welf. & Inst. Code § 224 et seq., Cal-ICWA) (collectively, ICWA) did not apply.[1]  She contends the finding was erroneous because the respondent Santa Clara County Department of Family and Children's Services (the Department) did not conduct a sufficient further inquiry into

_____

[1] Unless otherwise specified, all undesignated statutory references are to the Welfare and Institutions Code.

E.F.'s Indian ancestry.[2]  The Department contends the record amply supports the juvenile court's findings and orders.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.    *Events Leading to Dependency*

E.F. was born prematurely at 26 weeks of gestation with methamphetamine in her system, necessitating around-the-clock care.  E.F. was in the neonatal intensive care unit for the first 90 days of her life and was discharged to Mother's care at a sober living facility.  When E.F. was three months old, the Department obtained a protective custody warrant to place her in protective custody because Mother's untreated substance abuse issues put E.F. in an imminent risk to her health and safety.  The next day, on November 2, 2022, the Department filed a section 300 petition to initiate dependency proceedings.

The Department alleged that E.F. had suffered or was at substantial risk of suffering serious physical harm as a result of Mother's inability to provide care for E.F. due to Mother's substance abuse issues, and because Mother left E.F. at the hospital without any provision for support.

The whereabouts of E.F.'s alleged father is unknown, and he has not participated in the underlying proceedings.

### B.    *The Dependency Proceedings and ICWA Findings*

Initially, Mother informed the Department social worker that she had no known Indian ancestry and signed a parental notification of Indian status form confirming the same.  (See Judicial Council Forms, form ICWA-020.)  Mother's mother also denied any Indian heritage.  When the Department social worker interviewed Mother's father,

---

[2] We use the term "Indian" as that is the language used in the federal and state statutes.  No disrespect is intended.  (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1, (*Dezi C.*).)

[3] Mother's arguments on appeal pertain solely to her alleged Indian ancestry.  Accordingly, our summary of the facts is limited to those needed for resolution of the ICWA issue raised on appeal and to provide relevant context.

paternal aunt, and sister, however, they indicated E.F.'s great-great-grandmother may have been a member of the Shoshone tribe. They did not know to which specific Shoshone tribe the great-great-grandmother belonged, and they were not aware of any living relatives who could offer further information about their ancestry.

At the initial hearing in November 2022, Mother confirmed that she and E.F. had never lived on an Indian reservation, were not enrolled nor eligible for enrollment in any federally recognized tribe, and they did not possess an identification card to indicate a membership in any Indian tribe. She was informed that her father's grandmother "was born in a Native American tribe in Oklahoma." Mother did not know which tribe. Mother indicated that she had previously attempted to apply to enroll as a member of the Shoshone tribe in college, but the application was not accepted. As a result, the juvenile court found there was reason to believe that E.F. may be an Indian child and ordered the Department to conduct a further inquiry.

In January 2023, after several continuances to give the Department more time to complete the ICWA inquiries, the juvenile court held the jurisdiction and disposition hearings. The court found the allegations in the petition to be true, adjudged E.F. a dependent of the court, determined E.F.'s removal from Mother to be necessary, and ordered the Department to provide reunification services to Mother.

The court admitted six reports from the Department which detail, amongst other things, its efforts to investigate E.F.'s Indian ancestry between November 2022 to January 2023. (The Department's efforts are summarized in the next section.) At the disposition hearing, the court stated, "I have read and reviewed the . . . jurisdiction, disposition report, as well as the five other amended reports that were already admitted into evidence. . . ." The court thereafter adopted the Department's recommendations and made the following findings: that the social worker "has conducted a diligent inquiry into the child's possible Indian heritage," that "[t]here is no reason to know the child is an Indian child," and that ICWA did not apply.

At the 12-month review hearing, after Mother submitted to the Department's recommendations, the juvenile court terminated reunification services for Mother and set a section 366.26 selection and implementation hearing.  At Mother's request, the court set the section 366.26 hearing for a contested trial.

At the contested trial on July 1, 2024, the juvenile court admitted the Department's updated reports and addendum reports which included details of the Department's renewed ICWA inquiries since 2023.  The court found there was "no new information indicating a reason to believe or know that the child is an Indian child," and concluded that ICWA did not apply.  The court terminated Mother's parental rights and selected adoption by E.F.'s foster parents as the permanent plan.

Mother timely appealed.[4]

## C.    *The Department's Efforts Related to ICWA Inquiries*

We summarize only the relevant facts from the Department's voluminous reports related to its ICWA inquires.

*Interviews with Family Members.*  In late 2022, the social worker interviewed Mother's father, mother, aunt, sister, and cousin to obtain more information on the family's Indian ancestry.  Although Mother's sister and paternal relatives confirmed that E.F.'s great-great-grandmother had Indian ancestry, they were not able to provide any detail beyond her having lived on a Shoshone reservation.  The social worker confirmed with the family members that they were not enrolled in any tribe, nor did they believe the family to be eligible for enrollment.  In January 2023, the social worker also interviewed

---

[4] The disposition order is considered the "judgment" for appeal purposes and is generally the first appealable order in dependency proceedings.  (§ 395, subd. (a)(1); *In re Javier G.* (2005) 130 Cal.App.4th 1195, 1199.)  Although Mother did not appeal the ICWA finding made at the disposition hearing in January 2023, she may raise an ICWA challenge in this appeal from the order terminating her parental rights based on the juvenile court's continuing duty to inquire into a child's ICWA status throughout the dependency proceedings.  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 10.)

4

the alleged paternal grandfather, who confirmed that the paternal side of the family had no Indian ancestry.

Mother, without any degree of certainty, believed the great-great-grandmother belonged to the Choctaw tribe but referred the Department to her father to confirm. When the Department followed up with Mother's father, he denied any Choctaw ancestry. He reiterated to the social worker that the great-great-grandmother was born in a Shoshone reservation in Oklahoma in the early 1900s and lived on the reservation in her "early years." Mother's father indicated that his family has had no contact with the tribe for over 120 years. Other relatives with any knowledge of their history were deceased.

In May 2024, prior to the section 366.26 trial, the Department followed up with Mother, her parents, and her sister, and they each confirmed that they had no new information regarding E.F.'s Indian ancestry. The Department also attempted to reach Mother's aunt and cousin, but they did not respond.

*Letters to the Tribes.* In November 2022, the social worker sent e-mails and certified letters to 15 Shoshone tribes to ascertain information of E.F.'s Indian ancestry. The e-mails and letters included E.F.'s full legal name, birthdate, and place of birth, the parents' names and birthdates, the great-great-grandmother's full legal name, and the family's belief that E.F.'s great-great-grandmother was affiliated with the Shoshone tribe. The social worker also included a chart of E.F.'s family tree to the tribes that identified the names of E.F.'s parents, maternal grandparents, and maternal great grandparents. At the bottom of the chart, the social worker noted that "[m]aternal great great grandmother was born on Shoshone reservation. Her name is [D.H.R.]. Unknown date of birth. Deceased in 2013-2014."

The responding tribes all indicated that E.F. was not a member of their tribe nor eligible for enrollment. The Department maintained a detailed spreadsheet to record the information it received. The spreadsheet included the contact information for each tribe,

5

the date and method the Department contacted said tribe, the date of any response, and whether the child was a member of that tribe or eligible for membership.

Throughout the proceedings, the Department updated the court with any responses it received from the few tribes that had not yet responded to the Department's prior inquiries. The remaining tribes that responded also confirmed E.F. was not a member of their tribe nor eligible for enrollment.

The Department attached copies of its letters and the tribes' responses to each of the social worker's reports.

*Telephone Calls.* Throughout the dependency proceedings, the social worker called and left messages with the tribes that had not yet responded to her e-mail or letter. One of the tribes—Timbisha Shoshone Tribe—indicated that, to qualify for enrollment, the child must have one-quarter Native American ancestry and one-sixteenth Shoshone ancestry. E.F. did not meet the criteria.

The tribes who responded by telephone also confirmed that E.F. was not enrolled nor eligible for enrollment in the tribe.

*Letters to Government Agencies.* The social worker also made the same inquiries by e-mail and letters to the California Department of Social Services (CDSS) and the U.S. Bureau of Indian Affairs (BIA). When the agencies did not respond, in 2024, the social worker followed up with the CDSS and BIA. After multiple attempts to contact a tribe that had not responded to any of her prior seven inquiries , the social worker contacted the BIA and was informed that E.F. was not enrolled and had no eligibility for enrollment with that tribe based on the information provided.

## II.    DISCUSSION

### A.    *Applicable Law on the Duty of Inquiry*

Congress enacted ICWA to protect the best interests of Indian children and promote stability and security of Indian tribes and families by establishing minimum standards for state courts to follow before removing Indian children from their families.

6

(*Dezi C.*, *supra,* 16 Cal.5th at pp. 1128-1129, quoting 25 U.S.C. § 1902.)  In turn, the Legislature enacted and amended Cal-ICWA to mandate compliance with federal regulations (§ 224, subds. (a)-(c)), as well as expand ICWA's requirements on inquiry and notice.  (*Dezi C.*, at p. 1131.)

Under Cal-ICWA (§§ 224.2, subds. (a)-(e), 224.3), the juvenile court and county welfare departments have three distinct duties in dependency proceedings: (1) a duty to inquire whether the child may be an Indian child; (2) a duty of further inquiry if that initial inquiry creates a "reason to believe" the child is an Indian child; and (3) a duty to provide formal notice if that further inquiry results in a "reason to know" the child is an Indian child.  (*In re J.C.* (2022) 77 Cal.App.5th 70, 77-78.)  The duty to inquire whether the child is an Indian child continues throughout the proceedings.  (*Id.*, at p. 77.)  An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

There is a "reason to believe" the child may be an Indian child whenever "information suggest[s] that either the parent of the child or the child is a member . . . or may be eligible for membership . .  in an Indian tribe."  (§ 224.2, subd. (e)(1).)  If so, a duty of further inquiry arises.  (*Id.*, subd. (e).)  The duty of further inquiry requires the Department to interview parents and extended family members, contact the BIA and CDSS to identify names and contact information of the tribes in which the child may be a member or eligible for membership, and contact the tribe(s) and any other person that "may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (*Id.*, subd. (e)(1)-(3); see also *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 999 (*Ezequiel G.*), disapproved of on other grounds by *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18.)  Cal-ICWA requires that "[c]ontact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail contact to each

7

tribe's designated agent. . . ." (§ 224.2, subd. (e)(2)(C).) The Department shall share "information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination." (*Ibid.*)

If further inquiry results in a "reason to know" the child is an Indian child, the third duty to provide formal notice to the pertinent tribes arises. (§§ 224.2, subd. (d), 224.3.) "There is 'reason to know' a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child 'is an Indian child,' the child's or parent's residence is on a reservation, the child is or has been a ward of a tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 999; see also § 224.2, subd. (d); Cal. Rules of Court, rule 5.481(b).)

However, if the juvenile court finds that the Department's further inquiry and due diligence were "proper and adequate," and there is no "reason to know" whether the child is an Indian child, "the court may make a finding that [ICWA] does not apply to the proceedings. . . ." (§ 224.2, subd. (i)(2).) If subsequent information provides a "reason to believe that the child is an Indian child," the court shall "reverse its determination" and order the Department to conduct another further inquiry. (*Ibid.*)

**B.     *Standard of Review***

Under Cal-ICWA, the statute expressly states that the juvenile court's factual finding that ICWA does not apply is "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) Some appellate courts have applied a straightforward substantial evidence test while other courts have used a hybrid standard, reviewing the court's finding on "reason to know" for substantial evidence and the finding of "due diligence and proper inquiry" for abuse of discretion. (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101 [noting the split of authority but declining to resolve the issue as it was not before the Court].) With a well-developed record, the court has " ' " 'broad discretion to determine whether the agency's inquiry was proper, adequate and duly

8

diligent. . . ' " ' [Citations.]" (*In re H.M.* (2025) 109 Cal.App.5th 1171, 1181, quoting *Dezi C., supra*, 16 Cal. 5th at p. 1141.) This fact-specific determination "is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review. [Citations.]" (*Dezi C.,* at p. 1141.)

This Court has previously held that we review a juvenile court's ICWA findings for substantial evidence, and if the facts are undisputed, we independently review whether ICWA's requirements have been satisfied. (*In re I.F.* (2022) 77 Cal.App.5th 152, 162-163.)

## C.     *No Error in the Trial Court's ICWA Findings*

Although the parties on appeal dispute certain underlying facts, the Department concedes that the juvenile court correctly found there was a "reason to believe" that E.F. may be an Indian child, thereby triggering the Department's second duty of "further inquiry." Thus, the question is whether that further inquiry was sufficient to support the juvenile court's finding that ICWA did not apply.

Here, the Department conducted an extensive investigation. The social worker interviewed Mother's family members and extended family members which included her father, mother, sister, aunt, and cousin. The social worker also identified the names of family members who may have had knowledge regarding the family's Indian ancestry but were deceased. Throughout the proceedings, the social worker followed up with the family members to inquire whether the family had any new information to share; they all confirmed there were none. The social worker also sent numerous e-mails and letters to the BIA, CDSS, and 15 Shoshone tribes. The social worker's persistent effort in this case is commendable. Not only did she send letters and e-mails to the tribes with E.F.'s date of birth as well as both parents' names and dates of birth, but she also attached a chart of E.F.'s family tree that identified the names of E.F.'s maternal relatives and included all known information as to the great-great-grandmother that may have been affiliated with the Shoshone tribe. The social worker maintained a detailed spreadsheet to document

9

and update the information they received from the tribes. When a tribe did not respond, the social worker followed up with repeated e-mails and telephone calls to the tribes and government agencies. Over a period of 18 months, none of the investigations led to any indication that E.F. was an Indian child, had membership or eligibility for membership in any Indian tribe.

Based on ample evidence of the Department's diligence, we are not persuaded by Mother's argument that the Department failed to conduct a proper investigation.[5] "If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Further, Mother has not shown the juvenile court's findings to be arbitrary, capricious or whimsical. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.) The record indicates that the court read and reviewed the Department's reports, including the amended reports, which contained not only the summaries of the Department's ICWA inquiries, but also copies of correspondence between the Department and the various tribes regarding E.F.'s ICWA eligibility. Thus, we conclude that the juvenile court's findings and orders related to ICWA are supported by substantial evidence, and under the hybrid standard of review, we also conclude that Mother has not shown an abuse of discretion. Whether we apply the substantial evidence standard of review, or abuse of discretion, we discern no error in the juvenile court's findings and orders related to ICWA.

Mother's central contention is that the Department provided "sloppy notice" in its letters and e-mails to the tribes. Specifically, she argues the Department failed to include in its communications with the tribes information related to the great-great-grandmother's

---

[5] Mother's requests that we take judicial notice of the federal BIA's guidance on "active efforts" to maintain or reunite an Indian child with his or her family. Nothing in the record established E.F. as an Indian child. Accordingly, we deny Mother's request as the item is irrelevant to the issues presented on appeal.

tribal enrollment number, failed to specify the reservation she lived on, and failed to include the birthdates and addresses for all maternal relatives identified on the family tree.[6] Referencing Judicial Council form ICWA-030, Notice of Child Custody Proceeding for Indian Child, Mother contends such information was required to be included in the letters and e-mails sent by the Department to the tribes. Form ICWA-030, however, relates to the third duty of "formal notice" when there is a "reason to know" the child is an Indian child. (§§ 224.2, subd. (d), 224.3.) Here, the criteria for "reason to know" was not met and Mother has not cited any evidence from the record to demonstrate otherwise. The Department was not required to utilize Form ICWA-030 to conduct its further inquiry, nor is the failure to include information listed in that form dispositive as to whether the Department's inquiries were proper and adequate.

While the law mandates the court and the Department to carry out the duties of inquiry with due diligence and adequacy, it does not require the Department to achieve the improbable. "[The Department's] inquiry obligation is 'not an absolute duty to ascertain or refute Native American ancestry.' [Citation.]" (*In re D. F.* (2020) 55 Cal.App.5th 558, 570 [the Department's contacts with the BIA and 30 tribes were substantial evidence to support the Department meeting its duty of further inquiry].) In this case, where Mother's family could not even identify to which Shoshone tribe or band the great-great-grandmother belonged or on which reservation she had resided, it was not reasonable to expect the Department to ascertain said grandmother's tribal enrollment number. By the time of the dependency proceedings, Mother's family had been estranged from the tribe for over 120 years, and the great-great-grandmother was long deceased, as well as other members of the family who may have had knowledge of the

---

[6] Mother states that some of the letters stated E.F.'s and her parents' birthdates were unknown. As noted by the Department, the letters Mother referenced were the tribes' responding letters, not the social worker's initiating letters and e-mails which do include the birthdates of E.F. and her parents.

family's Indian history. "Where . . . a parent largely fails . . . to provide names and contact information for extended family members, [the Department]'s ability to conduct an exhaustive ICWA inquiry necessarily is constrained." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082.) "[W]e cannot ask the agency to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided." (*Ibid.*) Certainly, where the family member with possible ties to an Indian tribe is long deceased, along with other relatives who may have known that family member, we similarly cannot ask the Department to intuit information that no known living family member possesses.

In summary, whether under substantial evidence or abuse of discretion standard, the trial court did not err in finding that the Department's further inquiry complied with ICWA requirements.

### III.    DISPOSITION

We affirm the juvenile court's order terminating Mother's parental rights and ordering adoption as the permanent plan.

_____
RODRIGUEZ, J.*

WE CONCUR:

_____
GREENWOOD, P. J.

_____
LIE, J.

_In re E.F.; Santa Clara County DFCS v. A.D._
H052482

---

* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.